First case for argument this morning is 24-1669, GoTV Streaming v. Netflix. Mr. Alabi. Good morning. May it please the Court, my name is Amir Alabi and I'm appearing on behalf of the Appellant GoTV Streaming, LLC. There are numerous issues on appeal before this Court, but we submit that this appeal raises an important issue on damages. And that is, may a party, whether it's the defendant or the plaintiff, publish the amounts paid under license agreements that are admittedly not technically comparable. Can I ask you just an in-the-weeds kind of question? Yes, Your Honor. Which is, it seems to me, but I want you to confirm or deny this, that some of the damages issues go to kind of dauber questions about the admissibility of the reports, etc. But quite a number of them, and I think some of the key ones, seem to go with just testimony at trial, things said by the witnesses that weren't necessarily part of the report. They were just coming up. And you objected to at least some of them. And the Court rejected your objection. So this issue, the threshold issue about how this order was only a one-word order, that wouldn't take care of necessarily the stuff that happened at trial that you're complaining of, the statements at trial. Am I right about that? Or how do you see what happened at trial versus the dauber kind of report issue? Your Honor, I think you're right. I think some of these issues are commingled. So for example, and I'll try to parse it out as best I can, the fundware application development agreements, that was covered by the dauber motion and the one-word order. And that was Ms. Benes' affirmative, part of her affirmative testimony on damages on the defense side. The fundware pricing sheet, that was also dealt with squarely in the dauber order because that was only used by Ms. Benes in her affirmative opinion. Then we get to the Netflix settlement agreements, the 13 settlement agreements. The three where there is a dispute as to whether or not they are technically comparable or economically comparable was raised squarely in the dauber briefing and was part of Ms. Benes' affirmative report. So all of those issues are, we believe, resolved by the one-word order issue. But I guess some of the confusion, maybe because there are just too many different issues floating around in these three buckets, was how much, the stuff could have come in if it were coming in for a limited purpose. So the dauber issue may be different than some of the statements made by those witnesses. And that's where I'm kind of confused. And Your Honor, I was going to get to those very 10 licenses. And we disagree that the price, the amount of the licenses come in for any purpose. We filed a dauber motion on those 10 licenses because they were within Ms. Benes' report and she was relying on them under Georgia Pacific Factor II. So she relied on them for price and she also relied upon them for the form of the agreement that Netflix preferred lump sum agreements. The court denied our dauber motion on that. We also had a mill that was submitted simultaneously that says if you're going to allow Ms. Benes to talk about the form of the motion, of the licenses, you should not allow her to talk about the price because the price for non- Put up a demonstrative that showed that things went for price, correct? It did show it with price and that was done. And this is what- So you're agreeing that maybe some of her testimony could have come in in terms of testifying about lump sum licenses, but not the other stuff. That's why I think there's some parsing that goes on between the dauber and the testimony at trial. I don't quite know how to- Were you making an argument that under Factor II, the non-comparable licenses can't be admitted for any purpose, including to show a preference for a lump sum? No, Your Honor. I want to answer both questions. No, Your Honor. We made the argument that they were not technically comparable, so they should not be included for any purpose. That's what I mean. We did make that argument. Including just to show a preference for a particular type of arrangement? That's correct, Your Honor. We made that argument in the district court. We also, through a motion in limine, argued if you're going to let it in, because the defendant's position was while they admitted they weren't technically comparable, they should come in for lump sum, the price should not be shown to the jury. And both of those, the dauber motion and the mill, were denied in a one-word order. Judge Russ, I'm trying to get back to your question, which was we disagree that non-comparable, technically comparable licenses can be used to show preference for lump sum, particularly when the defendant did not produce all their licenses in the case. But having said that, if the judge disagreed with us and if this panel disagrees with us, there's a simple way for Ms. Bennis to get that testimony out or to cross Mr. Dell about lump sum, which is to say there are 13 licenses and all of them are lump sum. There's no need to put up a demonstrative that puts the price of those lump sum agreements up. And you said that the challenge to the demonstrative came in on a motion in limine, or based on what happened at trial? Both. So, we didn't know about the demonstrative. We had a motion in limine on don't show the price to the jury of any non-technically comparable licenses. That was denied in a one-word order. Then at trial, because we did not exchange demonstratives for cross-examination, the first time we saw the demonstrative was during Mr. Dell's cross-examination, and I objected at that time, and the objection was overruled by the district court. And the lead-up to the demonstrative, this was not used with Mr. Dell, for example, on the issue of lump sum. The lead-up question, and I'll give you the appendix slide because it's at page 631, was have you seen the pricing of the Netflix licenses? That's the first question that they asked Mr. Dell. Then they put up the demonstrative, and the title of the demonstrative, it's not about the lump sum. The title of the demonstrative was Netflix patent licenses, colon, lump sum payments under $2 million. Right. I mean, you're arguing the merits now, and you have a perfectly clear argument about the merits, the bottom line comparing apples to rabbits. It's just incredibly irrelevant, and you just can't do that, and it skews the horizon and all that stuff. Your expert's testimony was about a per-customer charge, right, and what, for the life of the patents, therefore ending up in a lump sum, not ending up in a running royalty or future litigation until these patents finally expire? Your Honor, he had both a lump, in his expert report, he had a running royalty opinion, so that was through the time of trial, and then a fully paid up lump sum. Both used the same methodology, which was to rely on a Learfield application development that charged a per-subscriber percentage. I'm asking what may just be a trivial question. If you got all the damages requested here, would your relations with respect to these patents with Netflix be over and done with, or is these patents last for a while, not that long, but 2029 or 2031, and maybe one case? We asked for a running royalty at trial, and if it was a running royalty, then it would have been running royalty through trial, and then we would have had future damages through either post-verdict running royalty, but the jury ultimately awarded a lump sum of, I forget the exact number, but I think it was $2 million or $2.5 million, Your Honor. That brings to mind just another side question, and we'll ask both sides to comment on this, this is just more housekeeping, but there are pending IPRs. There are. Related to these, and what I understand is that for the 175 and the 214, I have the numbers wrong, but there, you lost with respect to all the claims that are in dispute in this case. Is that correct? Your Honor, you're correct that we lost with respect to the claim that we elected to go to trial with, but with respect to claims that were live before trial, there are claims that survived. So on remand, whether or not Judge Klosner will force us to go to trial on the selected claims or reopen it depends on whether or not the 865 is back in the case. It depends on whether or not the court reverses on inducement. If we have to go back to the beginning, we believe we can elect different claims to retry the case. That's going to be a discretion of the district court, I believe, as to what, how far he reopens the case, and it depends on the scope of this court's opinion on the, if you reverse and remand. And on the 865, Netflix lost, and they have an appeal, correct? That's correct. On the 865. Can I just take you back to the damages for one close question, because it's hard. I think virtually, essentially all the damages issues I've had have involved the patentee, the patent owner, and their failure to apportionment and their comparability issues. I've never, I can't recall. I'm sure maybe I have. From this side, if they wanted to issue, to put forward a global license, which they did in this case, did that global license include any of the patents in dispute here? Because if it did, there'd be no prejudice to the patent owner if they didn't apportion it, didn't apportion, right? I mean, if I got a global, if I have a global license that includes all of these patents and 4,000 others, and it's for $10,000, there's no prejudice to you that I haven't apportioned them. Well, some of the licenses, I think you're asking about the 10 Netflix licenses. Some of those licenses, I do not believe were... What about the three? The three remaining Netflix licenses? The three, I believe one of them, the AST license, was not a portfolio license. I believe it was either a license for one patent or two patents. It was not... I'd have to go back and look at the record, but I think across the 13 licenses, some of the licenses that Netflix relied on were portfolio licenses. Wait, but these were licenses not of your patents? They're not of our patents. They don't even include... Okay, well, that was my special question. Then I misunderstood your question, Your Honor, and I apologize. The 13 Netflix licenses were Netflix's own settlement agreements with other parties and did not include... Over other patents, but the patents here weren't included, so there's a comparability thing, but not an apportionment. That's right. There's no comparability issue, and there's an apportionment. But one of them, didn't Ms. Bennis or somebody say the claim was very much like one of the claims here? I don't... Yes, so there's... Again, we have a total of 13 settlement agreements from Netflix. 10 of them were admittedly not technically comparable. On three of them, there were opinions of technical comparability from Dr. Villasenor that Ms. Bennis relied on, on just three. We're challenging on appeal the technical comparability analysis of two of those. One of them is unchallenged. So we, at least as the patent owner, agree that one of the Netflix licenses of the 13, there was a sufficient technical comparability opinion from Dr. Villasenor, but of course, we challenge the economic comparability analysis, or quite frankly, the lack of it by Ms. Bennis. She simply took the number, recited, you have to look at Georgia-Pacific factor, all the Georgia-Pacific factors, and did nothing else. But now we're getting into the weeds of the appeal, but we've challenged all of the Netflix settlement agreements for the lack of economic comparability analysis, or at least a sufficient non-gloss analysis. Can I answer this question? If we agree with you that the district court erred in dismissing the inducement claim, then what will be in, and also, either that alone or that and also erred in finding the 865 indefinite? Is there a new trial on liability in full, or liability just on the 865 and just on inducement with damages, again, assuming also we agree with you that there were harmful errors with respect to how the damages proof came in, and that, too, needs to be redone? I didn't see any discussion of the scope of a new trial in the briefs. So Your Honor, you're right. We neither party discussed that issue, and it's a bit of a thorny one. I know the answer that if you just find it on damages, it's theoretically possible for the court to remand it back just on a damage trial. Right. But we didn't see, I didn't see any Champlin refining. No, there is, and that's our fault. There's no discussion of the permutation of, we've asked for a new trial on all issues. So maybe we could have asked for a new trial only on the 865, only on, I think it's in Champlin. Well, wait, I think, but I think, I'm sorry to interrupt, but if you have one, I'm sorry, finish your answer. And so we did not parse it, and it may be a mistake on our part, we did not parse it to say, if we went on everything, remand, and no new trial on the patent where we did find infringement. We did not, we did not parse the requested relief, and that may be a mistake on our part. And if the court would like supplemental one-page briefing as to whether or not it's appropriate to do it, you've suggested, which is send it back just on damages on the, I guess it was the, I'm getting my patent numbers confused. On the 715. On the 715, but send it back for liability and damages on the 715, damages only, liability on the 865 and 245 on everything. Without any discussion, I guess, I mean, I assume the default is this is something that should be considered on a remand. I think, I think that's right, Your Honor, that. And that would include even, I guess, reversing on inducement would also potentially bring back a liability question for the 245. That's right, Your Honor, it would be an indirect. Which the jury said there was no direct infringement. That's right, because it was direct infringement based on testing by Netflix. And the inducement, who are the potential direct infringers? The end users, so it would be. End users, or is it the, like, it's referenced to AWS? It's not AWS, it's the end, it's the end user because it's the device that's claimed in the claim of the patent. Okay. If we were to reverse on inducement and indefinite, you want a new trial on liability, don't you? On the inducement, yes, and on the 865, yes, Your Honor. How does that feed into the question of whether or not we have a new trial, including a new trial on damages? Well, we believe that if you reverse on damages, of course, we get a new trial on damages. But if you reverse on liability, we do believe we get a new trial on damages because the damage. I mean, the reverse on damages, isn't there a question, if there's a Valbert violation, isn't there a question of whether or not you remand to the district court and say, please explain. You didn't give us a sufficient basis. I mean, that's the whole trigger for the one-line denial is we don't know what the district court thought. So, in some instances, I think there's a remand and say, please explain. I think that's what your adversary is asking for if we find fault. And I think you're asking for a brand new trial, at least on damages, assuming there were no other issues involved. That's right. At least in the city of Pomona case from the Ninth Circuit, the remand was for a new trial. It was not a remand for explanation. And we think, in this context, it would be a waste of time. I just don't know what you're really asking us to do here. So, we're asking for a remand for a new trial. And so, assume the circumstances were that we decided all the issues. We decided inducement and indefinite is in your favor. It would be a new trial on liability for inducement, new trial on the 865, and a new trial for damages on all three patents. Aren't you arguing that you may have some different theories of damages if those inducements and indefinites go your way? We would. That's why we'd have a new trial, both on the liability question of inducement and the 865, but also damages. Because the damage model would change if you had the 865 back. In fact, it did change at the district court level because the date of the hypothetical negotiation changed. And so, some of the functions that went into Mr. Dell's calculation changed because of that. And on that question, I mean, frankly, I think it's disputed, and I assume your friend will get up, because a lot of their brief was that it was the same amount of damages for each thing. So, at least leaving inducement aside, because that may, the liability there may change the damages picture. But just on the indefinite misclaim, their argument is there wouldn't be any more money. It's all irrelevant to increase that. And so, we disagree for two reasons. If you look at Mr. Dell's expert report where he also calculated lump sum, and I'm going to use the appendix slides, when the summary judgment was granted on the 865, the hypothetical negotiation date shifted by 18 months. And what ended up happening is one of the inputs that went into his lump sum calculation is the cost of capital, the average cost of capital WAC. And that went down from or up from 5% to 9%. So, the damage number actually changed and went down, even though the hypothetical negotiation date went forward. And so, if the 865 is back in the case, he now uses the new hypothetical negotiation date and the WAC number, which is the discounting component. He uses it for the 865 hypothetical negotiation date and the damages go up. So, we presented a damage number at trial potentially that was lower. We ended up doing the running royalty, but we could have presented the lump sum at trial if we had so chosen. Would there be something wrong with our saying it's perfectly clear that a remand is necessary and a new trial on a number of things is necessary, but we are not ourselves going to address some of the arguments about the, you know, one of the arguments is there's a unruled on intent challenge for basis for trying to get inducement out of the case, which the district court didn't rely on. So, we would say the district court can rely, can address that, possibly eliminating inducement on that separate ground, although this would be, you know, an emotion to dismiss. It's not clear how one could do that, but there would be an argument that the other side could make. Similarly, maybe an argument that the other side could make that the 865 does not itself have to be tried because as a result of stipulations and whatnot, it can't possibly make a difference, but that we wouldn't have to get into that. That could be argued on remand. So, on inducement, I'm going to take each one in turn. On inducement, if this panel makes clear that there's no categorical rule that a complaint cannot be relied on by an amended complaint for notice. I don't think the court could take care of the intent issue, which I think is a fact issue. You're not going to get a dispute from me that we, you have notice, but we still have to prove intent, and there could be arguments that they didn't have enough time to change their software, et cetera. Those, I don't think, can be resolved at the motion to dismiss stage because we pled specific intent. We pled intent, and so you take our pleadings to be true. But there could be other... There could be a summary judgment. Summary judgment. Your Honor, we could go take depositions. There could be a summary judgment. Conceivably, even.  Conceivably, even, there could still be a 12B6, but because it's Twombly standard, it might not be very promising, but that was not something we would have to decide. I would use language even harsher than not promising, but Your Honor, correct, there's theoretically, I can't think of it because of the way it was pled. I think it was pled properly, and there's... What about the other? What about the other? On the indefinite, let me try to remember the question. I think the other side has an argument. We don't need to get to the 865 because it couldn't possibly matter to the bottom line result on remand. So, again, that... I could be misstating. No, no. One, I think you have the record in front of you to make that decision. That is that the expert's damage model changed when the 865 was thrown out of the case. That's because of the timing. That's because of the timing of the hypothetical negotiation. Mr. Dell says, look, the parties for the hypothetical negotiation don't change, the Book of Wisdom doesn't change, but the timing does change what discounting factors... Does the scope of any possible inducement liability change according to whether it's the 865 or the 715 or 245? I don't believe so, Your Honor. And so we have to make tactical decisions when we go to trial. And so we present a running royalty damage model. We did not present the lump sum damage model. Those factors all change depending on what patents are in the case. It's inducement only with respect to the 715, right? No, the inducement was as to all three of the patents. But we can prove direct infringement of one of them, obviously. We've done so, and the 865 can be done both direct and in inducement. We would very likely not try an inducement case on the 865. In inducement, I think you said before that the direct infringer was the end user, and you think that's true not only for the client-side patent, but for the two server-side patents? There are other claims in the patent, which we elected to only go to trial on a limited number of claims the week before trial. There are other claims in the patent. And depending on what claims we elect, there may be an inducement. Even on the so-called server-side patent, it's not just the client-side one? Well, I don't remember if the 865 has, and I can look for the, Your Honor, if it has client-side components or not. But what you're previewing for us on a remand is going back to square one. I mean, you're talking about alleging claims that weren't previously alleged. No, Your Honor. Okay. So the way the district court handled it was we identified our claims. There were expert reports on numerous claims of each patent. And as we got to trial, we had to limit claims. And so we limited the claims we were going to try. It's very difficult to try 15, 16 claims in a single case. We limited our claims to two claims, two to three days before trial, and went to trial on those. So you think that would be undone here? That is, I think, at the district court's discretion. I think the district court could look at the factors and decide. We looked at this. There's a case law that says that if you get reversed, you're back to where you were before you tried the case. And there were numerous live claims in the case. And just like affirmative defenses, the first time you try a case, you may not try one of the affirmative defenses. The second time you pled it, there was discovery on it. You try it. You have some discretion on a remand to restructure your case. But it's also possible that stipulations you made or statements you made later in the case might have closed some doors that would otherwise be open. That's true. And that's outside the scope of this appeal. And if they raise that at the district court, we'll address it at the district court at that time. I'd say I've gone well past my time. Thank you, Your Honor. OK. We'll return to the rebuttal time. Let's hear from the defense. May it please the court, I'm happy to address any topic, but just to talk about some of these cross-cutting issues. If having relied on the same 4-cent royalty theory, regardless of the number of patents, there isn't any further remedy to be had if the damages judgment is upheld. On top of that, I do want to highlight, too, that on the server-side patents, the 865 and the 715, there was a stipulation in the case that we've highlighted in our brief that essentially let them convert any theories on those claims into direct infringement theories. And so regardless of what you're doing on inducements, on the server-side... I'm not sure I'm going to benefit from asking this question. I did not understand what you said, I mean, in the brief as well, about that conversion into direct infringement. Try to help me, but that may be going down a rabbit hole. I don't want to... Sure. So it was a stipulation. Imagine if you... To prove inducement on the server-side patents, the question is who would you be inducing? It wouldn't be the end user there. It would be the ISP, the company, the entity that is operating the server. And on those, the stipulation is Netflix, internet service providers, ISPs do not perform the functionality that GoTV accused of infringement. This helped them because it got them around divided infringement problems, but basically the deal with the stipulation was Netflix isn't going to argue, oh, that's being done by somebody else. It let them consolidate the focus of their infringement case to say everything that's being done is being done by Netflix. It let them present it as a direct infringement case in exchange for them not seeking discovery into these servers. So if they were to try to revive something on inducement with a stipulation that already let them focus on Netflix, there's no distinct inducement claim that can be presented there when you have a stipulation that the ISPs don't perform the function. And then the third cross-cutting issue, just before I get into some of the details and damages, is of course our Section 101 cross-appeal, which if we went on Section 101 would move to the next slide. And then we would move to everything else. On the damages, for the 10 Netflix licenses that received the most discussion, I just want to be crystal clear, those licenses were not part of the numbers that were presented by our experts, Ms. Bennis. She put up a slide. This is at 10.846 of the appendix in Volume 3. Showed a range of agreements. It had the three comparable Netflix licenses highlighted, the six fundware licenses, and the Learfield licenses they were relying on. And the question was, are these the agreements that you reviewed? Yes, they are. And did you focus on the 10 agreements, the seven fundware, and the three that are highlighted and identified as? Did you focus on those? Answer, I did. And tell us why you focused on those. I focused on the 10 that are highlighted. Again, we're talking about the three Netflix and seven fundware. Because they were identified as being the most technically comparable to the elements of the patents issued here. She then proceeds with her remaining slides. Which page were you just reading from? That is from 788 through 789 of the appendix in Volume 1. And the slide I'm referencing is in Volume, the slide I think is the clearest, in Volume 3 of the appendix at 10846. This is the slide in the accompanying testimony. No numbers on the slide. It's her agreements reviewed. It's 10846. 10846 in Volume 3 of the appendix. And this slide. Ms. Bennis presents. She presents. This slide has no numbers except for date. Correct. And what she highlights is these. What is highlighted is what she's going to rely on for anything to do with numbers. She does say sort of all 13 Netflix licenses inform her opinion on whether there will be a lump sum or not. But for purposes of the numbers, she's only focusing on the comparable agreements. And then in the slide pages that follow, every number that she is presenting in her testimony related to the agreements is related to those three comparable Netflix licenses and the fund. That's in her testimony. So this is putting a slide to use.  Exactly. So the only issue on those 10 Netflix agreements is that brief cross of their expert, Mr. Dow. And on that, I think the key question which came up in the new trial motion is that of prejudice. And the district court who sat through the trial, saw it in context, found that there wasn't prejudice. They were up so briefly. They were cumulative of everything else that was presented. He did address the issue on J. Because he said nothing. I mean, you said the district court said stuff. He didn't say anything in the order in the new trial motion. So the issue is the demonstrative of the 10 Netflix licenses gets used in the cross examination of Mr. Dow. Well, you're a TV expert. Very briefly. And the district court and they move for a new trial on that. And the district court denies the new trial, saying there wasn't any prejudice here. And and to be clear, it serves to take you through the sequence. Right. So the demonstrative is put up. There is there are two questions about the demonstrative. At that point, the court interjects. Page six, three, two of the appendix. This is volume one. The court interjects and asked the witness. These patents are not necessarily the similar patents to the one we're talking about today. Right. The witness says that's correct. There's one more set of questions. And then the court uses to admit them into evidence. It says an open court before the jury. I'm going to grant the objection. These are not patents necessarily similar to the ones you're talking about. They would be irrelevant. There's 10 patents and the numbers that are used in them. Then, as the district court found, don't come up again at any point. All the numbers that are used by Ms. Bennis are from the comparable agreements. All the numbers that are used in the closing statements are from the comparable. And that was an open court. Open court. And so the district court, who was the one in the room, saw the effect of this on the jury, in connection with the new trial motion, makes a finding of no prejudice. In question, is that the one that follows the page you cited? Yes. And to be clear... That's a two-page demonstrative? No, the demonstrative... I'm trying to actually look for the one that was presented. Correct. It is at volume three, page 10868. 10868? Yes. And to be clear, it's in the joint appendix, sort of following Ms. Bennis' slide, but it wasn't... You can see from the document number, it's shifted. This wasn't a slide that was used for Ms.  This was the demonstrative that was used for Mr. Van Laan. I mean, why is this not, as a matter of law, like the old Unilock, skew the damages horizon principle? You can't just say, we never pay more than $2 million, and say, jury, now please ignore that, for irrelevant things. So, one important difference from Unilock is the support found, the cumulative of this year, right? So, everything that had been presented within the same damages range, based on the comparable licenses, fully supported Ms. Bennis' opinion. And so, having some more licenses that are consistent with that range, and below what the jury actually awarded, in that context, wouldn't properly lead to a finding of prejudice. One of the other things is that the numbers appear there as part of, these are the lump sums. Yes. To avoid this issue, they could be presented without the numbers. But, the numbers are presented, they're in connection with testimony that Mr. Dell had been offering, that wasn't about comparable licenses or not, it was sort of sweeping testimony about Netflix's policies in general. And saying, Netflix doesn't have a policy against lump sum licenses, and so they put up all the Netflix licenses in the record to say, here are all the lump sums. Their complaint is with the dollar figure, but in the context of this case, when you have so many other licenses that come in that support Ms. Bennis' opinion, she doesn't affirmatively rely on these licenses. They're presented so briefly, the court interjects, asks the question to the witness, interjects and then says, these are irrelevant. Am I misremembering that some of the licenses that came in on her testimony are also in dispute here?  So then, in addition, they dispute, so the cumulativeness might go away if there was merit to the challenge to some of those. Right. Correct. And so, I'd like to take you through why there is no merit to that. So, on the three Netflix licenses, their complaint was that our expert didn't do adequate technical comparability. Dr. Villasenor, technical expert, had gone through in his report and found a comparable patent in each of the licenses. And these are ones like for the R2 license. It's a server for delivering an interactive application to a client. It's configured to modify the application based on at least one characteristic of the application. Like we're talking squarely in the same technology. Right. I guess I have some trouble with that. You know, it's a kind of trouble having to do with the same idea you have in that is presented by the 101 issue, that the level of specificity matters rather a lot. Other side, the 101 thing for now. To say that there is a patent on some sort of customization or something seems to me if that's a very, it could be a extremely low value patent when another patent under some broad category of customization, for example, might be a very, very high value patent. Just to say that they're kind of in the same technological family at some level hardly seems to get to the actual underlying question of comparable economic value. But, Judge Gardner, I think that it all has to do with what alternatives you have and what benefits you're going to get and all of that. Well, it does. But so to be clear, there's no, the patents in suit here were never licensed in a patent license. So everyone in this world as often is happening. You mean the three patents? Correct. There's no patent license. Everybody's trying to do the second best. Right. And so we have a series of fund where agreements. Ms. Bennis begins her damages theory with the fund where agreements, which were really software licenses. And so. Including the one that they relied on. Including the one they relied on. Right. So if anything, they're hard to value, right? Because they're for the performing the work of actually doing the software and somewhere in there is an implicit patent license. So she begins, she sets her range based on those agreements. She then turns to the three Netflix agreements, which are all within that same range as further confirmation to say in these other areas. So it's a step out. It's not these direct patents themselves, but we're in the same sort of tailoring it to the vice. You know, the R2 license claim. If you dig in to look at that claim, it's anything broader than these claims here. But, you know, the fact that that Netflix is paying for a similar claim and everything else that comes along with that and it's still within the same range is confirmation of her  This goes to Judge Post's question about the defense side versus the plaintiff side, which is if a plaintiff comes in and has a thousand patent license and says, I want that dollar figure. It can be very problematic. When the defense comes in and says, here's a thousand patent license and at least a portion of it is technologically comparable, that's a conservative opinion, right? You're you're you're offering at the very least you're getting the value here and then so much to boot. So that that was going on with the technological comparability of that on the fun where licenses. I think all the complaints really are mistaking this issue of what would it have cost to develop the software for Netflix, which is not the question on a bare patent license. And on the the three that so-called Netflix patent licenses, this isn't that Netflix was the licensee, not the licensor, right? Correct. OK. And on those, do I remember right that there was no effort at a per customer or per unit calculation so that these were all one had was essentially a total dollar value. Right. Ms. Bennett's presents them as a lump sum. The big picture. But a lump sum can. Right. If you if you have something to divide it by, you can figure out a per customer, per use, per what a unit something. But there was no such information as to these three Netflix Netflix as licensee patents. Right. Correct. Correct. But one thing that's very important here, remember, we're talking about technology where they're saying that the advantage this gives you is it simplifies your development process. Right. Netflix operates on four platforms. It could write its software for the four of those or it could allegedly use this method. So the entire construct that we're going to do a royalty that is based on this per user month method wasn't doesn't make any sense in that context where it's really talking about the savings to Netflix. So that's why Miss Bennett is approaching it from that context. She's saying you were willing to develop the entire software portfolio, license the patent and do all the work for this amount. Why would it not make any sense if you've got, I don't know, one hundred and fifty million customers regularly using as opposed to, I don't know, ten thousand customers using the really the the value is not doesn't have a different difference in market value just based on that. I mean, that that we don't see that differentiation license. But the idea is what this is saving you is you don't have to do your song. You don't have to do it twice. You don't have to do a version for Apple iOS and a separate version or an Android system that that the idea of sort of, oh, this is going to save you from doing on each devices. That is the sort of operator side focus that that as you think about this construct, Netflix wouldn't have agreed to this vastly inflated royalty. And again, this is the fight that went to the jury on the centerpiece of their damages theory. So it was specifically the experts were disagreeing with each other about whether a per customer basis for a payment was an appropriate one or not. Correct. Yes. And so the point about the Learfield license is you take all of these possible data points of licenses and go TV is rejected every single one of them. But the Learfield, which has one tier where it was talking about different users, and they've latched onto that because they were trying to leverage that into a per user royalty. It really was the outlier here. You know, unless the court has other questions. Let me just go back to where I started, at least, because you're obviously in your friend much more familiar with the record than I. Hypothetically, I mean, one straightforward thing to do it on the damages front would be to remand to give the district court another opportunity to explain themselves. But that doing that would not take care of some of the other issues that have been raised right about the testimony during the trial. So we got to kind of cover both of those. Is that right? Right. So I think, you know, everything that the one word order would would meaningfully apply to would be everything other than the 10 Netflix licenses we've been talking about. The 10 Netflix license is the real key is the harmlessness, the prejudice, what happened at trial. And you raise a suggestion in your brief that if we sent it back on the absence, the failure to articulate a rationale, your denials get thrown in there, too. And I don't see a basis for your having not appealed that for sending all of the determinations the district court judge made on your motions. Well, no, I would respectfully disagree. So if you look at our notice of cross appeal on 11869, when we broadly cross appealed from any and all adverse orders, ruling findings, we specifically mentioned the pretrial rulings that are 341 and 346, which are the subject of these one word orders. And then in our first brief before the court, we argued to you and hope I can address today why there shouldn't be any remand on these one word orders. But we say in that principal brief, but if they are getting a remand for lack of explanation, then we would want an explanation as well that could be reviewed on the failure to exclude Mr. Dowell's testimony as well. So given the scope of what is in the cross appeal and the fact that in our first brief we make this contingent argument, it is preserved. Now, on this issue of the one word, I trust you would say it doesn't matter that in the red brief you didn't make that argument in the cross appeal section. Not in the cross appeal section, because we'd already made it earlier. I mean, we'd made the contingency clear earlier, and so we didn't repeat it as a separate argument. On the one word order, though, I think, you know, there was no, unlike in the city of Pomona case, the answer to the case we cite, where there was an objection to the procedure being used, there was no objection in the district court to the lack of evidence. So the city of Pomona, the district court is given an opportunity. But in that opinion, they didn't rest on the fact that, yes, and they preserved it by filing an objection. There was no discussion of that objection, right? Right. Well, I'd flip it, which is that the other side didn't argue this isn't preserved because there had been an objection. So it just didn't come up for the Ninth Circuit there. But the basic background principle, because otherwise, what, just to be clear, you would be announcing a per se rule requiring this explanation on all pretrial motions, right? There are 37 pretrial motions in this case. So the logic of their position is if the district court doesn't have an opinion or an explanation of the ruling on every single one of those, then someone can come up on appeal and say, aha, I've got you. I get a remand. And I wonder how far this logic extends, right? I mean, the judge doesn't have to rule on motions in limine. It can always defer judgment to see it at trial. But is a one-word, sustained, overruled, is that not permissible because it's a one-word ruling? I think we are going to go down a path here. If you don't require, as there was in Pomona, some form of objection, some form of chance to let the judge contemporaneously provide this explanation, where you're going to really discourage rulings on pretrial rulings and a lot of sort of gotchas on appeal. I mean, it's only a small fraction of those rulings that they're complaining about on  But the logic is there needs to be a written opinion on all 37 of them. And so even if you were to rule that, as Judge Clevenger picked up on, at most, this is not getting them to a new trial. This would be, if there is explanation that's required, then the remedy is to get the additional explanation from the district court. But if it provides that explanation and sticks with the same ruling. With the exception of what you noted, the exception that dealing with the objection to the trial. Right. I think that one just gets assumed within the question of it came in. Is there prejudice in that context? To what extent does the fact that we're supposedly applying the law of the Ninth Circuit affect these issues? Well, I think the Ninth Circuit seems to say that if you have a one-line order, at least on the Daubert side, that's insufficient. But the Ninth and that, you don't have to object other than any further than what happened here. Well, that's where I especially disagree with you, right? The Ninth Circuit, in the city of Pomona case, where there was an objection, didn't have to decide the issue of, do you get this relief even in the absence of an objection? So you take the background principle of, if there's an objection, you're entitled to more explanation. They're relying on the federal rule of evidence that says, if the denial is flat, if it's unequivocal, then you don't need to make a further objection. Right. But that's entirely different. I mean, that goes to the substance, right? If you presented the substance of your argument pre-trial and had a definitive ruling one way or another, then you don't have to object again at trial. But their disagreement here is beyond what you told us in your briefs, right? Now, this argument you're making about subsidies. Right. So the first time I think that we saw the reference to the rule is in their reply brief. So this is our first opportunity to respond to that. This one word ruling, it's distinct from the concern about the merits of the objection. It is an objection to the procedure and what the judge did. And so that isn't, you know, I've given you my definitive ruling on the merits. You don't have to renew the objection. That is, the way you did it was procedurally improper. And requiring an objection in that context then gives the district court the opportunity to secure that. Is there an obligation on the movement to say something to the judge about more than just procedure? Like, oh, I don't like your one-liner. You've failed as a matter of substance to deal with this. It could be. I mean, or it could be the one. I mean, it could be. Is there a law in other circuits that support what you're telling me now? This distinction between a procedural objection and a subject objection? I hear you talking, Counselor, but I don't know what that body of law is. I'm familiar with it, if it's there. Well, I think the one word issue is a distinct issue. The Ninth Circuit has sort of, in the city of Pomona, gone far down this road of saying, yes, we're going to absolutely repeal it. In the city of Pomona, they also cite earlier cases in that circuit that certainly suggest that the one-liner is just insufficient because of use of discretion, period, regardless of whether it's substantive or procedural. The city of Pomona is a little odd because what happened was that what looked like a flat order, the judge raised some question about it, right? I'm not sure about the rating. So the city of Pomona wasn't a clean case where the appellate court was dealing with just a flat, no explanation, no attempt to say, I'm reserving, I'm rethinking about it. Right, there were a lot of motions in the city of Pomona. Some of them, there was a little bit more explanation that dribbled out. For some of them, there wasn't, and it was just a flat unexplained. Before you get to the 101, could you just briefly talk about the one issue I'd like you to address is that the argument back and forth about how the value for one is the value for all. One, do you agree that if we change the inducement piece of this, that that changes things and that none of the stipulations would apply with the scope of the alleged infringement changing? No, I mean, if the inducement comes in, so there, the testimony at trial, so on the 715 and 245 patents, the testimony in trial was, quote, my opinion is that the royalty rate would be the same, four cents, whether it's entitled to one or both of the patents at issue, if the benefits from Netflix's use of both of those patents are the same, the 621 of the appendix. Think of them as mirror images, right? One is the server side perspective. One is the user side perspective. Throughout the case, GOTV's position was it didn't make any difference. All the patents are the same, right? Their expert report, 12164, the technical benefits attributed to each of the patents are similar, if not the same. When the 865 drops out of the case, my reasonable royalty opinion remains unchanged on the running royalty. So there's nothing more to be gotten on inducement, right? They went to trial on the 715 patent, which is the server side perspective. They presented a four cent royalty theory, and their base was the entirety of every Netflix customer and every use. And the jury rejects that theory. And so they can't come back now on the user side and say, oh, well, if we've been able to present inducement, it wouldn't have been any different, right? For each one, if it's Netflix and the user, they already presented the full damages theory on Netflix. One side about your friend's discussion of the 18 month time differentiation. Right. So that comes at the end of the analysis, right? So the way that their expert constructed his lump sum is it's the exact same upfront theory. It's a four cents per user per month royalty, goes through the analysis, converts that to the lump sum. The only thing that changed when the 865, which was the indefinite patent dropped out of the case, was a different discount rate to try to reduce that to a lump sum. But everything you have to get through to get to that discount rate at the end was the theory that was presented to the jury that it rejected. I mean, I think we are in very serious danger of inconsistencies from one jury to another. And I would say, Judge Stronto, on your question, if there has to be a reset on inducement indefiniteness, I submit that under gasoline products, there really has to be a reset on everything, right? If this is because their damages theory depends on the extent of use, then we need to make sure that the jury that's considering extent of use is relying on the same infringement theory and understanding as the jury that was even finding infringement on the 715 patent. So given how untangled all of these are, if we end up in a proceeding where they're going back on damages for something or some of these new theories, I think it gets so entangled even with that original verdict that you can't know whether you're going to run into those inconsistencies. OK. Just a couple of minutes on 101. Yes. Thank you. So I think on 101, what we have here is patents are fundamentally directed to this abstract idea of presenting the data from the server in a way that's customized to the user device. And the alleged data structures here are at such a level of generality, it doesn't change the focus of the claim, right? The custom configuration is just saying dictate the look and feel of the app through things like what text to use, what font color to use, what background color to use, or anything else that would dictate the look and feel. Well, not anything else. The size might. It seems to me there are, and I frankly could not understand all of the terminology and some of it, I guess none of the claim constructions had occurred yet, but I guess it seemed to me that if you're trying to figure out what's the screen going to look like, there are certain aspects of the configuration, relative position of things, color may be one, although that could depend on the device abilities too, and that are not strictly dependent on the device properties. And some of them I think that are, I guess that were enumerated are the size of the display, the colors available, the resolution of the display, the processing power, if it's going to be not static, things like that. And that this back and forth between the client, the user at the client device, and the server then produces a couple of different customizations. One is customizing to the particular app, which is independent of the particular properties of the device, and then others that are dependent on the particular properties of the device with the server, then putting it all together and sending to a given device something that has been, I'm going to call it doubly customized. That seems, I mean, I don't quite understand intuitively what the value, what the needs are for this splitting up of different aspects or different issues that need to be resolved in order, at the end of the day, to get something on a particular device's screen. But there's a fair bit of that splitting up that's going on in the claim. So I think, Your Honor may be thinking about the 865 claim. I didn't see really a material difference in the 101 analysis among the three claims. Yeah, because I'm just not sure on the double customization. I mean, really, if you think of the 765, the claim that was found to be infringed at trial, it's transmitting the custom configuration, transmitting the compiled content, the custom configuration there. I mean, the things they were pointing to at trial was you have a play button, and the custom configuration was black text on a white background. And then the content comes over, and you might have sort of rows of pictures. So this could be as simple as the custom configuration is, I want to use blue text on a black background. And then the compiled content comes over, and it says what the text should say and maybe what the picture is on the page. Now, if there's a screen that can only do black and white, it might say, don't use blue text on a black background, use white text on a black background. I mean, we're talking about that level here. The look and feel was sending over just those details, text, font color, background color that could be the look and feel of the page, and then sending the content without limit on what that content is. The rendering blocks receiving this, this is just preexisting, you know, drop-down menus, text fields, images fields. And all of this is in using background languages that are available that are device generic. And so at the very least, the idea that we couldn't even make it past step one of Alice was incorrect. And I would submit to you on both steps of Alice here, what this really is, is confusing language designed to dress up fundamentally this idea of customizing this content from the server. Send over the customization, send over the content. But do you agree that we could not, even if we agreed with you on step one, step two would have to go back for factual analysis? I mean, I think in the context like this, there are examples where this court has gone ahead and done both step twos, but step two was not addressed by the district court at the time because it threw us out under step two. And this was all done on the pleadings, right? And then eventually you decided, I think, just after the claim construction, that you would accept judgment against your 101 counterclaim with no further factual development. So all of this characterization of the details, I don't mean to be tendentious about the word details, of the details, this confusing language in the claim language, which does, I think, actually match what's in the spec. So it's pretty much the same as really amounting to highly general ideas that are perfectly conventional to the extent that they are specific at all. There is no record to support any of this. It's just lawyer argument because this is not a case where the spec confesses the conventionality of everything claimed. And step two, we don't have that same strategy. So there might have to be further development on it. It's also not a case where the complaint itself alleged the lack of conventionality and provided that. But yes, the context here is we- The only thing that was ever ruled on was essentially a Twombly-based plausibility assertion, Twombly borrowing from 12b6 into 12c, which I think is pretty standard, that what is claimed here is plausibly specific and not purely functional. And if that's the question, I have a hard time seeing it on 12c. So if your honor can't get there on 12c, we should still get past the step one, right? I mean, this is where the step one and the step two, I think, bleed rather a lot into each other because I think we've talked about, in some of our cases, about how they bleed into each other. But also when the argument is this is nothing but what's available in computers generally or normal distributed processing. That's factual stuff. That is our step two argument here, right? Our step one argument. I thought your argument that the district court was wrong about step one, which is the only basis that the district court reached, is an argument that the words here simply are not specific enough to distinguish, to reflect real differences in how you go about doing things. How is that second part, that second aspect, not inherently factual? Well, I think that as this court has traditionally been approaching it, it's done de novo review of step one, treating it, as the district court did here, as a question of law. What is this directed to and focused to? And so the conventionality of it is squarely within step two. Some of it has, over time, bled into step one. But we're not depending on sort of factual conclusions regarding conventionality. It is an issue of law that this court reviews de novo in terms of deciding the focus of the claim. What are these claims directed to? And they're cast at a high enough level that a court itself can decide these are directed to the abstract idea. The district court here didn't say, oh, this is a Twombly issue. Oh, I need more facts here. The district court ruled, as a matter of law, that you have lost because I find that these claims are not directed to your abstract idea. We then come back. The parties sort of hash this out. There's stipulation. The court accepts it. The court says that its denial of our motion, quote, constitutes the court's judgment as a matter of law that the claims of the asserted patents are not invalid under section 101 and conclusively resolve section 101 issues for purposes of this case. So if there's more factual development to be done, it doesn't mean that you affirm the judge's ruling as a matter of law against us. You should rule on that as a matter of law. If you think more is done, then we should have that be vacated and a remand for more proceedings on that. OK. So we'll reserve a minute, a rebuttal, if your friend deals with the 101. And we're going to try to keep it even. So we exceeded by 10 on your side. We exceeded by 25. Was that it? We'll give you 12 minutes of rebuttal if you need it. I mean, a lot of this exercise has been filled with questions. So if there are no more questions, I don't think you need 12 minutes. But we'll give you 12 minutes. Thank you, Your Honor. And I hope to not use 12 minutes unless there are a lot of questions. I want to address at the outset one of the things that my colleague mentioned, which was an argument that Ms. Bennis did not rely or reference the 10 Netflix agreements, the 10 non-comparable agreements in her affirmative opinion. And I'd ask the panel to look at page 775 of the appendix and 776. So it's APX 00775, carrying over to the next page. This is Ms. Bennis' testimony. This is the introduction to her testimony, where she's asked what her opinion is. And she gives her opinion on lines 3 through 7, which I won't read, which is that it would be a lump sum payment between $500,000 and $1.7 million. And then she's asked, now, can you just preview for us how did you reach your opinion? Answer. So the attempt here, as always, is really take comprehensive approach and look at all the evidence. What does all the evidence show? So I look specifically at these fundware software agreements, and she discusses them. And then on the next page, starting at line 4, I looked at the Netflix agreements that we've heard about. Netflix has paid for patent licenses before for similar technology, so that was a good benchmark. It's also what are the benefits of these patents, how are they helpful to Netflix, if Netflix has to take a license to them, or even so, and she goes on. This is at the beginning of her testimony. This is before she puts any Netflix licenses up. She is referencing back to the Netflix licenses that Mr. Dell was questioned about, including the 10 non-technical licenses. And that's consistent with her expert report. Her expert report, to get to the number that she testified at trial, considered a lot of different factors, and that she didn't necessarily always talk about at trial, and that included those 10 licenses under Georgia-Pacific Factor 2. So I think it's not fair to say that Ms. Bennis, when she testified, ignored the 10 licenses. She brought them back in. They knew, everyone knew what was going on when all the licenses and the license amounts go up, and everyone knows what's going on when the defense damage expert mentions the Netflix licenses we've seen, and she testifies that she based her opinions on those, because that's consistent with how her expert report was drafted. So I think, with respect to the 10 Netflix licenses, it's not just an evidentiary issue. It's also an adult bear issue, because we move to exclude her reliance or discussion of those 10 agreements as part of her affirmative opinion. The other issue that my colleague raised is the idea that these 10 licenses are cumulative. There was a lot of other testimony to support the number, and he pointed to the Funware licenses and the three Netflix licenses. Of course, if you agree with us on our challenge to those licenses, the cumulative issue goes away. But I'd like to make a slightly different point. That's the point. The point was to put up as many licenses below $2 million as possible to anchor the jury to that number. If you look at the licenses, if you look at the bear license agreements, the patent licenses, not these software development agreements, there were a total of 13 discussed in the trial. They're all Netflix settlement agreements. 10 out of 13 were not technically comparable. That's over 76% of the total number of agreements. And we all know that, for a jury, a license agreement, a bear patent license, is easy to understand. The mumbo jumbo about, here is a software development agreement, this software developer was paid X amount of dollars, I'm going to make all these mathematical adjustments, not as persuasive to the jury. But if you include those, there were a total of 19 agreements, 10 of which were not technically comparable. 50%, over 50%. This was, I don't think that it's reasonable to conclude that it did not impact the jury. The point of it was to be cumulative, to stack the deck against Mr. Dell's testimony by pointing to, it's not just three settlement agreements, it's 13. It's not just nine of these software development agreements, which you may not buy, you've got 13 other license agreements, that's what Netflix pays. Can I just ask you, I should know the answer to this, but this record has escaped my mind. You had the two patents before the jury. As far as the number you were asking for, did you differentiate? Was your position, if one or both of these, this is the number we deserve and we do? The royalty rate, yes. The royalty rate was $0.04 per subscriber. And I wanted to address that, based on the benefit that Netflix received from those patents. If you had an inducement claim, we'd be looking at device counts. Everyone who has a Netflix account doesn't just watch it on one TV. Subscribers are a different royalty base than device counts. As to the point as to whether or not, if you sustain the damage award, if you don't reverse it, whether or not that fully compensates for the inducement claim, we would have a different damage model and we'd look at different benefits, which is the benefit to Netflix customers and what that would be worth to Netflix. And that was never in front of the jury. I didn't do it in my opening remarks, but I did want to talk about these six fundware agreements. Because there's a nuance that's very important as to why there was no technical comparability as to those agreements. Those were software development. These are all arguments you made in your brief. These are all arguments that were in the brief. I apologize, Your Honor. I should have mentioned that. These were all software development agreements. Dr. Villasenor, the defendant's technical expert, in his report said he could not determine if those pieces of software that were developed for the customers practiced the assertive patents. He couldn't figure out. He didn't have enough information. He then said, but Dr. Malik, the plaintiff's expert, found that a piece of software developed for Learfield did practice the patents. And because these other six software applications used something called mass content management, if Dr. Malik thinks they infringe, that Learfield infringes, these do too. And that's his technical opinion. He made an incorrect assumption that Dr. Malik concluded that it was mass content management that practiced the patents. That was not his opinion. And if you look at appendix 05745, what Dr. Malik looked at was he looked at this Learfield product, and they had taken the mass custom configuration, which is an off-the-shelf software. I'm getting a little uncomfortable about this simply because we don't want you to raise the specter where your friend gets it from. Fair enough. Because it wasn't coming from anything. Fair enough. My colleagues have questions about it, certainly. Fair enough. I just wanted to, I didn't address it. And my colleague had raised it, but there's at least a, if you look at it, there's at least a technical challenge. Unless the panel has questions about anything else, we've gone an hour and a half, and I'm very thankful. I guess I just want you to talk for a minute about 101 and why this case is on one side or the other side of the very, very important line about a required level of concreteness of technique. Not how to use it or how to make it, but just concreteness of the technique itself that is important in a fair number of our cases at step one of Atlas. Your Honor, and I agree that some of step two has carried over into step one. And so we think that this is very much like the visual memory case. So there's a problem, a technical problem to be solved, which is at the time of the invention, this was the Blackberry time. Thousands and thousands of different devices with different types of capabilities, memory, GPS, screen size, screen resolution, et cetera. And in order to roll out an app, if you're an app developer, you couldn't roll out one app. You'd have to roll out an app developed for every single one. You understand that you have not yet gotten to the only point that matters is whether the solution was relevantly concrete. You understand what the problem is. I do, Your Honor. And we do think it is. The concept of a wireless device generic template, custom configuration, page description, those are all concrete steps of taking, in some instances, aspects that reside on the device and moving them to a distributed architecture. But the wireless device generic template is a novel item. It's not even taking an item from the device and moving it to the server. It's creating a new intermediary element. And if you go through the claim limitations, and we discuss it with the brief, there are a number of items like that, including the page description, that are all described in the claim itself and then are all described in further detail in the specification. In visual memory, wasn't there a computer system that was trying to do the same thing and the patent there was improving the computer functionality? Yes. My question is here, when I read this, I'm saying a cool idea came up, which was to do all this on the server and relieve the app supplier and the owner of the device from having to do something. And so somebody really smart had to write some software. And they went to somebody who wrote software. And they said, now just go put this on the computer. And that's what they did. So what's the improvement in the computer functionality or capability? The improvement, there was one in visual memory because the previous way in which the memories were structured created inefficiencies. And the invention there was, we'll do something that's actually working on the computer. So why isn't this simply a matter of a really cool software writer writing the software and then handing it over to the machine people and saying, go find a computer that's Because there are improvements. So the improvements. Specifically to the functioning of the computer. So here. Now about the server computers, right? You're talking about the original application is housed entirely on the device. This now goes to a distributed architecture system where some of the capabilities are housed on the server and some are housed on the device. And what's created that's new is this wireless device generic template and page description. Because otherwise, what you do is you have to generate a unique page description for each device. Instead, what you do is you create, and this is what's not in the software before the invention, the generic template that is then filled in by the information from the server. So that's the unique addition to the So we're improving the distributed system, not the computers. Pardon me? What are we improving here? You're improving on systems. The distributed system. It was originally not distributed. It was solely on the server side. You move to a distributed system and you add to it the generic template. You're not actually affecting the computers. The phone or the server capable of doing all this? You're improving the way they interact with one another to improve the performance. Of what? Of the application residing on... Not of the computer. Not of the computer. But I don't see the court's precedent as requiring an improvement, for example, to memory. It can be an improvement to how a distributed architecture works. A number of our software patents have actually dealt with the conclusion that there was an improvement in the way the computer was functioning. That's true. This is an improvement in the way the server and the network communicate with one another to prevent the problem of having to create individualized programs for every type of phone. Thank you. Thank you, Ron. Use your time, John. I was trying to be fast. I think Judge Cotter is exactly right on visual memory in terms of the improvement to the memory system itself. Here, what we really have is the use of the computer as the tool and just this basic customization. I want a page with a picture. If it's going to go to a device with a high-res screen, then I might use a high-res picture. If it's going to be a low-res screen, I might use a low-res picture. If it's going to go to a device with a color screen, I might have the color of my trademark font that's the look and feel, the blue color I mentioned before on a black background, change it to a white on a black background if there isn't color on the screen. It is all pitched at such a high level of generality, not on the details of this, but the broad concepts of a custom configuration and compiled concept. They're claiming it at that conceptual level in a way to try to sweep in all of this customization. Thank you. We thank both sides. I appreciate that you both tried to be very helpful. We obviously had a lot of fun. So thanks both sides for taking the time.